1

2

3

4

5

6

7

8                           IN THE UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10    ELVIA H. ALCANTAR,

11              Plaintiff,                          No. 2:10-CV-2638 GEB GGH

12        vs.

13
      MICHAEL J. ASTRUE,                            FINDINGS AND RECOMMENDATIONS
14    Commissioner of
      Social Security,
15
              Defendant.
16    _____/

17              Plaintiff seeks judicial review of a final decision of the Commissioner of Social

18    Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB")

19    under Title II of the Social Security Act ("Act").  For the reasons that follow, the undersigned

20    recommends that plaintiff's motion for summary judgment be granted in part, defendant's cross-

21    motion for summary judgment be denied, the case be remanded for further proceedings under

22    sentence four of 42 U.S.C. § 405(g), and that judgment be entered for plaintiff.

23    BACKGROUND

24              Plaintiff, born March 6, 1961, applied on May 2, 2008 for DIB alleging that she

25    became disabled on October 12, 2007 (Tr. at 16, 29, 108-115, 124-133.)  Plaintiff contended that

26    she was unable to work primarily due to hyperthyroidism and atrial fibrillation.  (Tr. at 28-29,

                                                    1

1 │ 128.)

2 │       In a decision dated November 19, 2009, Administrative Law Judge ("ALJ")

3 │ Timothy S. Snelling determined plaintiff was not disabled.  (Tr. at 21.)  The ALJ made the

4 │ following findings:[1]

5 │         1.    Claimant meets the insured status requirements of the
       │               Social Security Act through December 1, 2012.

6 │

7 │         2.    Claimant has not engaged in substantial gainful activity
       │               since October 12, 2007, the alleged disability onset date (20
       │               CFR § 404.1571 *et seq*.).

8 │

9 │         3.    Claimant has the following medically severe combination
       │               of impairments: a history of atrial fibrillation, induced by
       │               hyperthyroidism, a history of Graves disease, a history of
10 │              gastrointestinal bleed secondary to medication, a history of
       │               multi-nodular goiter, hypertension - controlled with
11 │              medication, anemia, and borderline cardiomegaly with mild

12 │
─────────────────
[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the
13 │ Social Security program.  42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to
disabled persons with low income.  42 U.S.C. § 1382 et seq.  Both provisions define disability, in
14 │ part, as an "inability to engage in any substantial gainful activity" due to "a medically
determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).
15 │ A parallel five-step sequential evaluation governs eligibility for benefits under both programs.
See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S.
16 │ 137, 140-42, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:
               Step one:  Is the claimant engaging in substantial gainful
17 │ activity?  If so, the claimant is found not disabled.  If not, proceed
to step two.
18 │               Step two:  Does the claimant have a "severe" impairment?
If so, proceed to step three.  If not, then a finding of not disabled is
19 │ appropriate.
               Step three:  Does the claimant's impairment or combination
20 │ of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
404, Subpt. P, App.1?  If so, the claimant is automatically
21 │ determined disabled.  If not, proceed to step four.
               Step four:  Is the claimant capable of performing his past
22 │ work?  If so, the claimant is not disabled.  If not, proceed to step
five.
23 │               Step five:  Does the claimant have the residual functional
capacity to perform any other work?  If so, the claimant is not
24 │ disabled.  If not, the claimant is disabled.
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
25 │       The claimant bears the burden of proof in the first four steps of the sequential evaluation
process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the
26 │ burden if the sequential evaluation process proceeds to step five.  Id.

1   septal hypokinesis and trace mitral regurgitation (20 CFR
    404.1520(c)).

2

3   4.   Claimant does not have an impairment or combination of
         impairments that meets or medically equals one of the
         listed impairments in 20 CFR Part 404, Subpart P,
4        Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, and
         404.1526).

5

6   5.   After careful consideration of the entire record, I find that
         claimant has the residual functional capacity to perform a
         wide range of light work as defined in 20 CFR 404.1567(b)
7        so long as she does not climb ladders, ropes, or scaffolds;
         avoids exposure to moderate hot and cold temperature
8        extremes; and avoids all exposure to hazardous machinery
         and heights.

9

10  6.   Claimant is capable of performing her past relevant work as
         a hospital laundry worker.  This work does not require the
         performance of work-related activities precluded by
11       claimant's residual functional capacity (20 CFR 404.1565).

12  7.   Claimant has not been under a disability, as defined in the
         Social Security Act, from October 12, 2007 through the
13       date of this decision (20 CFR 404.1520(f)).

14  (Tr. at 16-21.)

15  ISSUES PRESENTED

16          Although plaintiff identifies six issues in her motion for summary judgment,

17  several of these issues overlap to a significant degree and are not presented in an order that

18  logically comports with the five-step sequential evaluation process.  When carefully scrutinized,

19  plaintiff's motion actually presents four issues for review: (1) whether the ALJ erred in his

20  evaluation of the medical opinion evidence; (2) whether the ALJ improperly discounted

21  plaintiff's subjective complaints; (3) whether the ALJ improperly assessed plaintiff's ability to

22  perform her past work at step four; and (4) whether application of the Grids at step five requires

23  an award of benefits.

24  LEGAL STANDARDS

25          The court reviews the Commissioner's decision to determine whether (1) it is

26  based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

3

1   the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

2   Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

3   Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

4   as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

5   625, 630 (9th Cir. 2007), *quoting* Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The

6   ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and

7   resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations

8   omitted).  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more

9   than one rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

10  ANALYSIS

11                    Whether the ALJ Erred in His Evaluation of the Medical Opinion Evidence

12                    Plaintiff contends that the ALJ failed to provide specific and legitimate reasons

13  for rejecting the opinion of her treating physician, Dr. Kamali, and gave improper weight to the

14  opinion of the consultative examiner, Dr. Sharma.

15                    The weight given to medical opinions depends in part on whether they are

16  proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

17  F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[2]

18  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater

19  opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d

20  1273, 1285 (9th Cir. 1996).

21  \\\\

22

23          [2]  The regulations differentiate between opinions from "acceptable medical sources" and
    "other sources."  See 20 C.F.R. §§ 404.1513(a), (e); 416.913(a), (e).  For example, licensed
24  psychologists are considered "acceptable medical sources," and social workers are considered
    "other sources."  Id.  Medical opinions from "acceptable medical sources" have the same status
25  when assessing weight.  See 20 C.F.R. §§ 404.1527(a)(2), (d); 416.927(a)(2), (d).  No specific
    regulations exist  for weighing opinions from "other sources."  Opinions from "other sources"
26  accordingly are given less weight than opinions from "acceptable medical sources."

1    To evaluate whether an ALJ properly rejected a medical opinion, in addition to

2 considering its source, the court considers whether (1) contradictory opinions are in the record;

3 and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a

4 treating or examining medical professional only for *"clear and convincing"* reasons.  Lester, 81

5 F.3d at 830-31.  In contrast, a *contradicted* opinion of a treating or examining professional may

6 be rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating

7 professional's opinion generally is accorded superior weight, if it is contradicted by a supported

8 examining professional's opinion (supported by different independent clinical findings), the ALJ

9 may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

10 Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

11 weigh the contradicted treating physician opinion, Edlund, 253 F.3d at 1157,[3] except that the ALJ

12 in any event need not give it any weight if it is conclusory and supported by minimal clinical

13 findings.  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir.1999) (treating physician's conclusory,

14 minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a

15 non-examining professional, without other evidence, is insufficient to reject the opinion of a

16 treating or examining professional.  Lester, 81 F.3d at 831.

17    In this case, there is no dispute that plaintiff suffers from hyperthyroidism[4] and

18

19    [3]  The factors include: (1) length of the treatment relationship; (2) frequency of
examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
20 (5) consistency; (6) specialization.  20 C.F.R. § 404.1527.

21    [4] "Hyperthyroidism is a disorder that occurs when the thyroid gland makes more thyroid
hormone than the body needs...Hyperthyroidism has several causes, including Graves' disease;
22 one or more thyroid nodules; thyroiditis, or inflammation of the thyroid gland; ingesting too
much iodine; and overmedicating with synthetic thyroid hormone, which is used to treat
23 underactive thyroid...Hyperthyroidism has many symptoms that can vary from person to person.
Some common symptoms of hyperthyroidism are nervousness or irritability; fatigue or muscle
24 weakness; trouble sleeping; heat intolerance; hand tremors; rapid and irregular heartbeat;
frequent bowel movements or diarrhea; weight loss; mood swings; and goiter, which is an
25 enlarged thyroid that may cause your neck to look swollen...The three treatment options are
medications, radioiodine therapy, and surgery."  See U.S. Department of Health and Human
26 Services, National Endocrine and Metabolic Diseases Information Service, "Hyperthyroidism"

1   atrial fibrillation[5] resulting from her hyperthyroidism and Graves' disease.[6]   To the contrary, the

2   ALJ specifically found that these impairments combined are severe.  (Tr. at 18.)  Instead, the

3   contradiction lies between the various physicians' opinions on plaintiff's limitations resulting

4   from these impairments.  In regard to this, the ALJ stated:

5           In August 2008, internal medicine consultative evaluator Satish
            Sharma, M.D., diagnosed hyperthyroidism, hypertension and Iron
6           [sic] deficiency anemia.  Claimant was also noted to have a large
            size goiter and a history of recurrent palpitations and increased
7           fatigue.  Exhibit 5F.

8           In arriving at the above residual functional capacity assessment, I
            credit the August 2008 opinion of internal medicine consultative
9           evaluator Sharma to the extent that he indicated limitation to a
            range of light work.  Exhibit 5F.  Significantly, the September and
10          October 2008 opinions of the Disability Determination Services
            (DDS) medical advisors both show an unlimited residual
11          functional capacity except for postural and environmental
            limitations.  Exhibits 6F and 10F.  I give weight to these
12          assessments, but not determinative weight in light of the treating
            physician's assessments discussed more fully below.  I find that
13          claimant's combination of severe impairments limit [sic] the
            claimant's residual functional capacity to a wide range of light
14          work.

15          I give less weight to the October 2008 and August 2009 opinions
            of treating physician Kamali indicating the claimant is unable to
16          perform even a limited range of work at the sedentary exertional
            level.  Exhibits 13F, 14F, 15F, and 16F.  First, Dr. Kamali's severe
17          limitations are totally inconsistent with the relatively mild clinical

18  ─────────────────────

    (2008), available at http://endocrine.niddk.nih.gov/pubs/Hyperthyroidism.
19

20      [5] "Atrial fibrillation is an irregular and often rapid heart rate that commonly causes poor
    blood flow to the body.  During atrial fibrillation, the heart's two upper chambers (the atria) beat
21  chaotically and irregularly - out of coordination with the two lower chambers (the ventricles) of
    the heart.  Atrial fibrillation symptoms include heart palpitations, shortness of breath and
22  weakness."  See Mayo Clinic, "Atrial Fibrillation" (2011), available at
    http://www.mayoclinic.com/health/atrial-fibrillation/DS00291.

23      [6] "Graves' disease, also known as toxic diffuse goiter, is the most common cause of
    hyperthyroidism in the United States.  Graves' disease is an autoimmune disease, which means
24  the body's immune system acts against its own healthy cells and tissues.  In Graves' disease, the
    immune system makes an antibody called thyroid stimulating immunoglobulin (TSI), which
25  mimics TSH and causes the thyroid to make too much thyroid hormone."  See U.S. Department
    of Health and Human Services, National Endocrine and Metabolic Diseases Information Service,
26  "Hyperthyroidism" (2008), available at http://endocrine.niddk.nih.gov/pubs/Hyperthyroidism.

1   findings and inconsistent with the evidence that shows the
claimant's impairments are all pretty well controlled with
2   medications.  If claimant's level of dysfunction were as complete
as indicated by Dr. Kamali, the doctor would be seeing claimant
3   more often and treating claimant more aggressively than has been
the case.  On the October 2008 assessment form at exhibit 13F, Dr.
4   Kamali indicated that claimant's multiple medical conditions were
"stable" and that he was seeing claimant "every four weeks."
5   However, on the August 2009 assessment form at exhibit 16F, Dr.
Kamali indicated that he last saw claimant in April 2008.  There is
6   no evidence that Dr. Kamali has treated claimant since May 2008,
other than perhaps for the purpose of completing the functional
7   assessment forms obtained by counsel.  Exhibit 2F.  In sum, to the
extent that the cited limitations are inconsistent with the medical
8   record and examining opinions, I find Dr. Kamali's opinions to be
inordinately limiting and an opinion that appears to be based
9   wholly upon claimant's subjective complaints.  And yet I have
given those subjective complaints less credible weight than he did.

10

11   (Tr. at 20-21.)

12          A careful review of the record reveals that Dr. Kamali's conclusions are often

13   conflicting and inconsistent.  On October 9, 2008, Dr. Kamali completed two questionnaires – a

14   cardiac RFC questionnaire and a physical RFC questionnaire – which both listed diagnoses of

15   atrial fibrillation and hyperthyroidism.  (Tr. at 335-39, 340-44.)  In the cardiac RFC

16   questionnaire, Dr. Kamali indicated that plaintiff's impairments could be expected to last at least

17   twelve months, plaintiff had no side effects from her medication, could sit for a total of 4 hours

18   and stand/walk for a total of less than 2 hours in an 8-hour day, and would need to take 2

19   unscheduled breaks every 4 hours for about 2 hours each.  (Tr. at 336-37.)  However, that same

20   day, in the physical RFC questionnaire, Dr. Kamali indicated that plaintiff's impairments cannot

21   be expected to last at least twelve months, plaintiff had side effects (dizziness and sleepiness)

22   from her medication, could sit for only 30 minutes at one time and less than 2 hours in an 8-hour

23   day, could only stand for 5 minutes at one time and less than 2 hours in an 8-hour day, was

24   required to walk every 10 minutes for approximately 10 minutes, and would need to take an

25   unscheduled number of unscheduled breaks during the workday.  (Tr. at 340-42.)

26   \\\\

7

1    Subsequently, on August 24, 2009, Dr. Kamali again filled out a cardiac RFC

2 questionnaire and a physical RFC questionnaire.  (Tr. at 345-49, 350-54.)  Despite the fact that

3 atrial fibrillation was listed as a diagnosis in both 2009 questionnaires, plaintiff's prognosis was

4 inexplicably assessed as poor in the physical RFC questionnaire, but fair in the cardiac RFC

5 questionnaire.  (Tr. at 345, 350.)  These obvious inconsistencies are troubling.

6    Moreover, Dr. Kamali provides little support for his extremely severe limitations.

7 For example, in his most recent August, 2009 assessments, Dr. Kamali opined that plaintiff's

8 symptoms were constantly severe enough to interfere with attention and concentration needed to

9 perform even simple work tasks (tr. at 346, 351); plaintiff was incapable of even low stress jobs

10 (tr. at 346, 351); could not even walk a single city block without rest or severe pain (tr. at 346,

11 352); could only sit for 10 minutes at a time, stand for 10 minutes at a time, and sit/stand/walk

12 for less than 2 hours in an 8-hour day (tr. at 346-47, 352); was required to walk every five

13 minutes for approximately 10 minutes (tr. at 347)[7]; needed to take unscheduled breaks every hour

14 as much as possible for about 30 minutes (tr. at 347, 352); needed to elevate her legs at 45

15 degrees for 45% of the day with prolonged sitting (tr. at 347, 352); could never lift even less than

16 10 pounds (tr. at 347, 353); could never look down, look up, turn her head right or left, or hold

17 her head in a static position (tr. at 348); could never twist, stoop/bend, crouch/squat, climb

18 ladders, or climb stairs (tr. at 348, 353); and could never use either hand to grasp/turn/twist

19 objects, never use fingers for fine manipulations, and never use either arm to reach during an 8-

20 hour day (tr. at 348).

21    While a treating physician should certainly take into account the claimant's

22 reported symptoms in his evaluation, the court agrees that Dr. Kamali's opinion as to plaintiff's

23

24    [7] Further internal inconsistencies are readily apparent.  For example, even though plaintiff
can supposedly sit for 10 minutes at a time, Dr. Kamali indicates that plaintiff must walk every
25 five minutes.  Dr. Kamali also does not explain how plaintiff is supposed to walk every five
minutes for approximately 10 minutes when she apparently cannot walk the length of a city block
26 without rest or severe pain.

1  limitations appears to be based almost entirely on plaintiff's subjective complaints.  Dr. Kamali's

2  RFC assessments cite very little objective test results and clinical findings, and rely heavily on

3  plaintiff's account of her symptoms.  To be sure, the objective evidence in the record, such as the

4  ECG studies at times showing irregular heart rate and atrial fibrillation (tr. at 252-55, 333-34),

5  laboratory results showing abnormal levels of thyroid-stimulating hormone (tr. at 315-16), and

6  radiology results suggesting inflammation of the thyroid gland (tr. at 327), as well as the hospital

7  records, support the diagnoses of hyperthyroidism and resultant atrial fibrillation.  But, Dr.

8  Kamali does not provide any support for his conclusion that these conditions render plaintiff

9  virtually incapacitated.  To the contrary, he noted in May, 2008 that plaintiff's atrial fibrillation is

10  controlled with medication.  (Tr. at 179.)  Although some of the specialist consultants to whom

11  Dr. Kamali referred plaintiff considered and/or recommended the option of more aggressive

12  treatment such as radioiodine therapy or surgery (tr. at 176, 181-83), plaintiff on at least one

13  occasion declined such therapy (tr. at 176), and there are no medical records or reports indicating

14  that Dr. Kamali himself ever recommended such treatment.  Furthermore, apart from the 2009

15  RFC questionnaires, there are no treatment notes or other evidence in the record indicating that

16  Dr. Kamali treated plaintiff in 2009.[8]  For all these reasons, the court agrees with the ALJ that Dr.

17  Kamali's opinion is not entirely reliable.

18  _____

19  [8] Plaintiff argues that the ALJ drew an improper adverse inference when he noted that "if claimant's level of dysfunction were as complete as indicated by Dr. Kamali, the doctor would be seeing claimant more often and treating claimant more aggressively than has been the case."  (Tr.

20  at 20.)  SSR 96-7p provides that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular

21  medical treatment without first considering any explanations that the individual may provide...For example:...The individual may be unable to afford treatment and may not have

22  access to free or low-cost medical services."  SSR 96-7p, at *7-8.  The court agrees that the above inference was improper given that the ALJ never inquired as to the reasons why plaintiff

23  declined radioiodine therapy or why plaintiff did not see Dr. Kamali regularly in 2009.  However, plaintiff's reasons for declining radioiodine therapy recommended by another specialist

24  consultant are irrelevant to the question of why Dr. Kamali only discussed and recommended more conservative treatment with medication.  Additionally, any reasons plaintiff may have had

25  for not seeking regular treatment in 2009 do not change the fact that Dr. Kamali, by not regularly treating plaintiff in 2009, had little recent clinical data and findings to support his severe August

26  24, 2009 RFC assessments.

1      Nevertheless, the court cannot conclude that the ALJ's findings with respect to

2   plaintiff's residual functional capacity are supported by substantial evidence in the record.  In

3   determining that plaintiff had the residual functional capacity to perform a wide range of light

4   work, the ALJ gave significant weight to the opinion of internal medicine consultative evaluator

5   Dr. Satish Sharma.  Dr. Sharma opined that plaintiff could lift 10 pounds frequently and 20

6   pounds occasionally, and that she was limited to standing and walking for 6 hours with normal

7   breaks.  (Tr. at 294.)  Generally, when a treating physician's opinion is contradicted by an

8   examining professional's opinion, supported by different independent clinical findings, the ALJ

9   may resolve the conflict.  Andrews, 53 F.3d at 1041 (citing Magallanes, 881 F.2d at 751).  Here,

10  the problem with the ALJ's reliance on Dr. Sharma's assessment is that Dr. Sharma did not

11  review any of plaintiff's prior medical records.

12      The regulations require that a consultative examiner be given any necessary

13  background information about the plaintiff's condition.  20 C.F.R. § 404.1517.  Background

14  information is essential because consultative exams are utilized "to try to resolve a conflict or

15  ambiguity if one exists."  20 C.F.R. § 404.1519a(a)(2).  An opinion on a well-documented

16  medical problem given after only a one-shot examination, *without recourse to the prior medical*

17  *records*, is not one which can generally be relied upon.  This is especially true when the medical

18  records contain results from multiple objective tests, such as ECG studies, laboratory tests, and

19  radiology tests, that the treating physician used to support his opinion.  Even if plaintiff is a

20  relatively reliable historian, her lay account of her test results and treatment is no substitute for

21  Dr. Sharma's own evaluation of the significance of the objective test results.[9]

22      Furthermore, the State Agency physicians who reviewed plaintiff's file, Drs.

23  Amon and Bayar, did not have an opportunity to examine plaintiff and did not discuss any of

24

25      [9]  This is not the first time that this court has admonished the Commissioner for giving
significant weight to the opinion of an examining physician who did not have access to a
claimant's prior medical records.  To the extent the Commissioner continues this practice, he
26  does so at its own peril.

1   plaintiff's prior treatment records and objective test results.  Their relatively cursory opinions

2   appear to have been largely based on consultative evaluator Dr. Sharma's assessment.  (Tr. at

3   297-303, 317-18.)  They do not address the results from the ECG studies, laboratory tests, and

4   radiology tests, nor do they explain why their conclusions based on these tests are different.

5            In sum, the ALJ erred in his evaluation of the medical evidence, and his

6   assessment of plaintiff's residual functional capacity is not supported by substantial evidence.

7   Accordingly, the court must determine whether the case should be remanded for further

8   proceedings or an award of benefits, a decision within the discretion of the court.  Smolen, 80

9   F.3d at 1292.  An award of benefits is appropriate where "no useful purpose would be served by

10  further administrative proceedings" and "the record has been thoroughly developed."  Varney v.

11  Sec'y of Health & Human Servs., 859 F.2d 1396, 1399 (9th Cir. 1988).  This is a recognition of

12  the "need to expedite disability claims."  Id. at 1401.  Generally, where the ALJ fails to provide

13  adequate reasons for rejecting the opinion of a treating physician, the opinion is credited as a

14  matter of law.  Lester, 81 F.3d at 834.  However, in this case, as discussed above, the treating

15  physician's opinion as to plaintiff's functional limitations is not well supported and at times

16  internally inconsistent.  Consequently, the court cannot credit the treating physician's opinion as

17  a matter of law.  Instead, the court finds that remand is necessary for an additional medical

18  consultation by a consultative evaluator who is provided full access to plaintiff's prior medical

19  records.  After reevaluation of plaintiff's residual functional capacity, the ALJ may also deem it

20  appropriate to conduct a supplemental hearing with vocational expert testimony regarding any

21  limitations found, if necessary.

22            Other Issues Presented

23            Finally, because the court concludes that the ALJ erred in his evaluation of the

24  medical evidence and plaintiff's residual functional capacity, the court will not address plaintiff's

25  remaining issues as to the ALJ's assessment of plaintiff's credibility or the ALJ's alleged errors

26  at step 4 and 5 in the sequential evaluation process.  On remand, the ALJ will have the

11

1  opportunity to consider whether revision of his analysis concerning any of these issues would be

2  appropriate in light of any new evidence or findings.

3  CONCLUSION

4       Accordingly, for the reasons outlined above, IT IS HEREBY RECOMMENDED

5  that:

6            1.  Plaintiff's motion for summary judgment (dkt. no. 14) be granted in part;

7            2.  Defendant's cross-motion for summary judgment (dkt. no. 15) be denied;

8            3.  The case be remanded for further proceedings under sentence four of 42 U.S.C.

9  § 405(g); and

10           4.  Judgment be entered for plaintiff.

11       These findings and recommendations are submitted to the United States District

12  Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within

13  fourteen (14) days after being served with these findings and recommendations, any party may

14  file written objections with the court and serve a copy on all parties.  Such a document should be

15  captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the

16  objections shall be served and filed within fourteen (14) days after service of the objections.  The

17  parties are advised that failure to file objections within the specified time may waive the right to

18  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

19  DATED: December 7, 2011

20                    /s/ Gregory G. Hollows
                      UNITED STATES MAGISTRATE JUDGE

21

22  GGH/wvr
    Alcantar.2638.ss.fr.wpd

23

24

25

26